UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIMOTHY WILSON,

    *Plaintiff*,

    v.

UNITED STATES OF AMERICA.

    *Defendant*.

Criminal No. ELH-10-0488
Related Civil No. ELH-15-1507

**MEMORANDUM OPINION**

Timothy Wilson has filed a motion pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside, or correct sentence.  ECF 195 (the "Petition").[1]  Wilson challenges his 2011 drug convictions, asserting a violation of his Fourth Amendment rights as a result of a traffic stop that led to a scan by a drug detection dog and then a search of his vehicle.  Citing *Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609 (2015), Wilson maintains that the traffic stop was unlawfully prolonged, without reasonable suspicion of criminal activity, in order to conduct the canine scan.  ECF 195 at 4.  In addition, Wilson claims that his trial attorney "was ineffective for not challenging the constitute[ionality] of the search [of the vehicle] absent reasonable suspicion."  *Id.* at 5.

The government opposes the motion on several grounds.  ECF 202.  Mr. Wilson has not filed a reply.

No hearing is needed to resolve the Petition.  For the reasons set forth below, I shall deny the Petition.

---

[1] The case was originally assigned to Judge William D. Quarles, Jr.  When Wilson filed his Petition in May 2015, the case was reassigned to me, in anticipation of Judge Quarles's then impending retirement.

## I.   Factual and Procedural Background

Mr. Wilson and his codefendant, Luis Ahorrio, Jr., were charged in a two-count superseding indictment with conspiracy to distribute 280 grams or more of cocaine base (*i.e.*, crack cocaine), in violation of 21 U.S.C. § 846, and with possession with intent to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. § 841.  ECF 83.  The charges were rooted in a routine traffic stop that began at approximately 7:26 p.m. on July 23, 2010, in Worcester County, Maryland.  During the stop, which was recorded on video, a drug detection canine, Camo, alerted to the presence of narcotics in a rented Toyota Corolla with a New Jersey license plate.  Ahorrio was the driver of the vehicle and Wilson was sole passenger.

Maryland State Officer Corporal Howard Kennard effectuated the stop for speeding on U.S. Route 113 and for following another vehicle too closely.  ECF 95 (Memorandum Opinion of November 18, 2011), at 1-2.  Kennard had been a Maryland State trooper since 1997.  ECF 78 (transcript of hearing held July 29, 2011) at 21.  Using a laser, he determined that the vehicle was traveling 65 miles per hour, which was ten miles above the speed limit.  ECF 95 at 2 n.3.  Trooper First Class Dana Orndorff arrived at the scene at 7:37 p.m., before completion of the traffic stop, and began to walk around the vehicle with the dog.  ECF 95 at 6.  After Camo alerted, the police conducted a search of the vehicle and recovered a substantial quantity of cocaine base.  ECF 47-1 (Criminal Investigation Report) at 5; *see also* ECF 68-2 (Report of Investigation by Special Agent Mark Joyner).

Through counsel, Mr. Wilson filed, *inter alia*, a pretrial motion to suppress evidence.  *See* ECF 28.  Ahorrio also filed a motion to suppress.  *See* ECF 43.  In his submission, Wilson's defense attorney argued, in part, that the defendants' detention "exceeded that necessary for

Corporal Kennard to address the alleged traffic violations." *Id.* at 9.  He also asserted:  "There was insufficient reasonable suspicion to justify the extended detention of the Toyota which was subjected to a canine scan and therefore the subsequent search of the car was prohibited by the Fourth Amendment." *Id.*; *see also id.* at 7-9.  Further, Wilson's defense counsel complained, *id.* at 6:  "Though [Corporal Kennard] informed Mr. Ahorrio that he was to be issued a written warning at 7:33:14 p.m., Corporal Kennard did not write the warning.  Instead, he intended to engage Mr. Ahorrio in further conversation . . . he returned to his car and called the dispatcher to give notice that he intended to conduct a canine scan."  Among other cases, defense counsel cited *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).  *See* ECF 28 at 7.

The government opposed the various defense motions in a consolidated response.  ECF 47.  It also submitted several exhibits, including Kennard's Criminal Investigation Report (ECF 47-1) and the videotape of the stop.  *See* ECF 47 at 2 n.2.

Cpl. Kennard's criminal investigation report (ECF 47-1 at 6-7) reflected that the canine scan was conducted based on "the totality of the following indicators: [1] The driver was not on the rental agreement nor listed as an additional operator. [2] The driver produced a Pennsylvania driver's license but was living in New York City. [3] The driver's hands were very shaky when he handed me his information. [4] The driver and passenger gave conflicting information about their trip. The driver stated they were traveling to Macon, Georgia and the passenger stated they were going to North Carolina. [5] The passenger kept showing me an officer's badge and informed me that his brother was 'on the job.' [6] The passengers [sic] breathing were [sic] shallow and rapid."[2]

---

[2] The government asserts (ECF 202 at 4-5) that Cpl. Kennard's report was consistent with the video recording of the stop.  The video was introduced into evidence by the government at the suppression hearing.  *See* ECF 75.

Thereafter, on June 24, 2011, Wilson's lawyer filed a supplemental motion to suppress evidence. ECF 71. In the supplement, defense counsel argued that the canine did not have a reliable track record. ECF 71 at 1. The government opposed Wilson's supplemental motion. *See* ECF 72. In addition, it submitted several additional exhibits.[3]

Wilson's lawyer filed a supplemental memorandum on July 26, 2011 (ECF 73), in which he relied on what was then a recent decision of the Fourth Circuit, *United States v. DiGiovanni*, 650 F.3d 498 (4th Cir. 2011). Defense counsel argued that the traffic stop "exceeded both in scope and duration what is permitted by the Fourth Amendment and that no reasonable articulable suspicion existed to justify Mr. Wilson's detention." ECF 73 at 1-2.

Judge Quarles heard testimony and argument on various motions on July 29, 2011. ECF 74. The suppression hearing resumed on November 15, 2011. ECF 90. The transcripts for the two proceedings are docketed at ECF 78 (7/29/11) and ECF 104 (11/15/11), respectively.

After the hearing in July 2011, but before Judge Quarles ruled, Wilson's defense attorney submitted yet another memorandum in support of the motion to suppress, addressing the canine's entry into the vehicle. ECF 79. Defense counsel cited, *inter alia*, *Illinois v. Cabales*, 543 U.S. 405 (2005). *See* ECF 79 at 2. The government responded at ECF 80, supported by another exhibit.

In a Memorandum Opinion (ECF 95) and Order (ECF 96) issued November 18, 2011, Judge Quarles denied defendants' motion to suppress.[4] The ruling resulted in a published opinion. *See United States v. Wilson*, 278 F.R.D. 145 (D. Md. 2011).

---

[3] The government also opposed a supplemental motion filed by Ahorrio. *See* ECF 68.

[4] Judge Quarles also ruled on other defense motions, not pertinent to the Petition.

In his ruling on the suppression motion, Judge Quarles made the following findings of fact, in relevant part, ECF 95 at 1–7 (footnotes omitted):

> On July 23, 2010, Maryland State Police ("MSP") Corporal H. Kennard saw a Toyota Corolla (the "Car") with a New Jersey license plate speeding on U.S. Route 113 in Worcester County, Maryland. Compl. ¶ 3; ECF No. 47, Ex. 1 [hereinafter Crim. Inv. Report] at 5–6. The Car was also following another car too closely. *Id.* at 6. Ahorrio was driving, and Wilson was the passenger. *Id.*
>
> At about 7:26 p.m., Kennard stopped the Car. *Id.;* ECF No. 47, Ex. 2 [hereinafter Video]. Kennard told the Defendants that the stop was being recorded, and asked for Ahorrio's license and registration. Crim. Inv. Report 6. Ahorrio gave Kennard a Pennsylvania driver's license and a car rental agreement. *Id.* Wilson gave Kennard a New Jersey driver's license. *Id.* at 6. As Wilson opened his wallet, he revealed what appeared to be a police badge. Compl. ¶ 3. Ahorrio's hands were "very shaky," and Wilson's breathing was "shallow and rapid." Crim. Inv. Report 7.
>
> Kennard returned to his car, and activated the sound recording system. *Id.* at 6; Video at 7:27 p.m. MSP K–9 Trooper First Class Dana Orndorff arrived and approached Kennard's window. Compl. ¶ 4; Crim. Inv. Report 6. Kennard told Orndorff that Ahorrio was not listed on the rental agreement and he "wanted to investigate further." Crim. Inv. Report 6; Video at 7:27 p.m.
>
> Kennard left his car and motioned for Ahorrio to leave the Toyota. *Id.;* Video at 7:28 p.m. Kennard asked where Ahorrio lived; Ahorrio said that his "new address" was in New York, and Wilson had rented the Car. Crim. Inv. Report 6. Ahorrio also said that he had driven in a separate car to Wilson's house in New Jersey that day, and they were traveling to see drag races. Video at 7:29 p.m.
>
> Kennard then approached Wilson, still sitting in the Car, and informed him that Ahorrio should be added as a driver on the rental agreement. *See id.* Wilson said they were going to North Carolina for drag races. Crim. Inv. Report 6. The two spoke briefly about drag racing, then Wilson said that he understood that Kennard had a job to do, and he had "a brother on the job." Video at 7:30 p.m. Wilson "continu[ously] displayed" the badge in his wallet. Crim. Inv. Report 6.0
>
> While Kennard was speaking to Wilson, Orndorff approached Ahorrio. *See* Crim. Inv. Report 6. Ahorrio told Orndorff that he and Wilson were driving to drag races in Georgia. *Id.* This conversation was not recorded.
>
> Kennard then asked Ahorrio why he had not obtained a New York license, and whether his Pennsylvania license was valid. *Id.* Ahorrio stated that he had just

moved, and his license was "supposed to be" valid. Video at 7:30–31 p.m.
Ahorrio "started to become increasingly nervous as he seemed unsure of his
answers." Crim. Inv. Report 6.

The officers returned to Kennard's car; *See id.* Orndorff said that Ahorrio
had told Orndorff that he would "talk to [Ahorrio] a little bit more" while issuing
him a warning. Video at 7:32 p.m. Kennard ran Ahorrio's license and confirmed it
was valid. *Id.* Kennard returned to Ahorrio and told him that he would be issued a
written warning. Crim. Inv. Report 6; Video at 7:33 p.m. As Kennard was
preparing the warning, he "started a casual conversation" with Ahorrio about New
York for about two minutes. *Id.;* Video at 7:33–35 p.m.

Kennard then said that his agency was conducting aggressive traffic
enforcement. Crim. Inv. Report 6; Video at 7:35 p.m. He asked Ahorrio if all the
property in the Car was his, and if he would mind a canine scan of the Car. *Id.*
Ahorrio stated that only one bag in the Car was his, and the officers would need
Wilson's consent to the scan. *Id.*

Kennard returned briefly to his car and told Orndorff that he wanted to
conduct a canine sniff of the Toyota. Video at 7:35 p.m. Kennard then conducted
a consensual pat-down search of Ahorrio, and directed him to stand in front of
Kennard's car. *Id.* at 7; Video at 7:36 p.m. Orndorff opened the passenger side
door of the Toyota and had Wilson get out. Crim. Inv. Report at 7; Video at 7:36
p.m. . . .

After the pat-down, Kennard indicated that Wilson should stand by
Ahorrio. Video at 7:36 p.m. Kennard asked Wilson if everything in the Car was
his. *Id.* Wilson replied, "I guess, yeah." *Id.* Wilson pulled out his cell phone, and
Kennard told him to put it away. *Id.* Wilson said that he was playing a game on it.
*Id.*

At 7:37 p.m., Orndorff began walking K–9 Camo around the Car. Video.
The passenger door was open, and Camo put his front paws on the passenger side
floorboard and sniffed the floor, seat, console, and glove box. Hr'g Tr. 120:18–21,
137:16–19 July 29, 2011. Camo also stood on his hind legs near the driver's door.
Video at 7:37 p.m.

Between 7:37 and 7:38 p.m.—11 to 12 minutes after the initial stop—
Kennard told the Defendants that the dog had "alerted to the car." Video. Kennard
asked if there was "any reason why" the dog might have alerted; Wilson said he
"wouldn't know" because he had just picked up the car. Video at 7:38 p.m.

At 7:39 p.m., Kennard began to search the Toyota. Crim. Inv. Report 7;
Video. . . .

Under the front passenger seat, Kennard found a large brown paper bag. Crim. Inv. Report 7. After opening it, he smelled cocaine. *Id.* Inside was a white bag containing a zip-lock bag with 347 grams of crack cocaine. *Id.;* Compl. ¶ 6. The brown bag also had a July 16, 2010 receipt from a Burger King less than a mile from Ahorrio's New York residence. *Id.* ¶ 7.

Judge Quarles determined, in part, ECF 95 at 11-12: "Kennard was justified in detaining the Car while he performed 'traditional incidents' of the stop, which included reviewing the rental agreement, running Ahorrio's license, and beginning to prepare a warning.[] Kennard also had Orndorff perform a canine scan of the Car while Kennard wrote up the warning. . . . Camo alerted about 11 or 12 minutes after the initial stop.[]"

In the alternative, Judge Quarles ruled, *id.* at 12-13: "Even if the scan had not been performed within a reasonable time for a routine traffic stop, continued detention would have been permissible because Kennard had reasonable suspicion that the Defendants were involved in criminal activity." In this regard, Judge Quarles pointed to the following:

Kennard saw that Ahorrio's hands were "very shaky," and Wilson's breathing was "shallow and rapid." Crim. Inv. Report 6–7. Although Ahorrio was driving the Car, he was not listed as a driver on the rental agreement. *Id.* at 6. Ahorrio's license was from Pennsylvania, even though he said he lived in New York. *Id.* Wilson's wallet contained an item resembling a police badge, and he stated that he had a "brother on the job." *Id.;* Video at 7:30 p.m. Kennard may have reasonably suspected that Wilson was trying to curry favor with law enforcement. *See* ECF No. 47 at 10. The Defendants gave conflicting statements about the destination of the drag races; Wilson stated they were traveling to North Carolina, but Ahorrio said Georgia. Crim. Inv. Report 6. Further, although Ahorrio had driven to Wilson's house in New Jersey that day, the Defendants had been driving a rental car. *Id.* A reasonable officer may have assumed that the Defendants were attempting to hide their identities if the Car was connected to criminal activity. ECF No. 47 at 11.

ECF 95 at 12–13 (footnotes omitted).

The case proceeded to a jury trial beginning November 28, 2011. ECF 109. It concluded on December 5, 2011 (ECF 116), and culminated in defendants' convictions. ECF 118; ECF 119. At Mr. Wilson's sentencing on March 7, 2012 (ECF 148), Judge Quarles imposed

concurrent terms of 120 months' incarceration as to Count One and Count Two.  ECF 153 (Judgment).

On March 8, 2012, Mr. Wilson noted an appeal to the United States Court of Appeals for the Fourth Circuit.  ECF 149.  He argued that the District Court erred in denying his motion to suppress because the canine's positive alert was not sufficiently reliable to establish probable cause so as to justify the vehicle search.

The Fourth Circuit affirmed in an unpublished opinion issued on November 26, 2013. *United States v. Wilson*, 547 Fed. App'x 232 (4th Cir. 2013) (per curiam); *see* ECF 188.  As to the canine's reliability, the Court concluded that the officers were entitled to the good faith exception because, "at the time of the search, we had indicated that a narcotics detection dog was per se reliable if it had completed an adequate training program and obtained the appropriate certification." *Id.* at 234.  The mandate issued on February 27, 2014.  ECF 192.

Mr. Wilson filed a petition for certiorari with the United States Supreme Court, which was denied on August 25, 2014.  *See Wilson v. United States*, ____ U.S. ____, 135 S. Ct. 52 (2014).  Wilson's § 2255 Petition timely followed on May 26, 2015.  ECF 195.

Additional facts are included in the Discussion.

## II.  Discussion

### A.

Section 2255(a) of Title 28 of the United States Code, under which Wilson filed his Petition, provides relief to a prisoner in federal custody only on specific grounds: that the sentence was imposed in violation of the Constitution or laws of the United States; that the court was without jurisdiction to impose such a sentence; that the sentence was in excess of the maximum authorized by law; or that the sentence is otherwise subject to collateral attack.

The scope of review of non-constitutional error is more limited than that of constitutional error. A non-constitutional error provides a basis for collateral attack only when it involves ""a fundamental defect which inherently results in a complete miscarriage of justice"" or is "inconsistent with the rudimentary demands of fair procedure." *United States v. Mikalajunas*, 186 F.3d 490, 496 (4th Cir. 1999); *see United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015).

Under 28 U.S.C. § 2255(b), the court must hold a hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief. . . ." *See*, *e.g.*, *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Courts have determined that a hearing is not necessary where "the motion . . . fail[s] to allege sufficient facts or circumstances upon which the elements of constitutionally deficient performance might properly be found [or] where the defendant has failed to present any affidavits or other evidentiary support for the naked assertions contained in his motion." *United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1998) (internal quotation marks and citation omitted); *accord United States v. McGill*, 11 F.3d 223, 225-26 (1st Cir. 1993). On the other hand, a hearing is generally "required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve this issue." *United States v. Robertson*, 219 Fed. App'x 286, 286 (4th Cir. 2007); *see also United States v. Ray*, 547 Fed. App'x 343, 345 (4th Cir. 2013).

In reviewing the Petition, the Court is mindful that a self-represented litigant is generally "held to a 'less stringent standard[ ]' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-

represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (same). Nevertheless, in my view, no hearing is necessary to resolve Wilson's claims.

## B.

Wilson contends that his Fourth Amendment rights were violated because the traffic stop was unlawfully prologed, without reasonable suspicion, in order to permit the drug detection dog to scan the vehicle, and the dog's alert led to a search of the vehicle, in which crack cocaine was found. ECF 195. As noted, Wilson relies on *Rodriguez v. United States*, ____ U.S. ____, 135 S. Ct. 1609 (2015), to support his contention. Moreover, he explains that he did not raise this issue on direct appeal because the "[*Rodriguez*] Case wasn't available. This discession [sic] wasn't available until after may direct appeal was final." ECF 95 at 4.

The government counters that Wilson's "Fourth Amendment Claim is procedurally barred because [Wilson] cannot show any valid reason why he failed to raise it on direct appeal." ECF 202 at 2. As the government points out, "*Rodriguez* did not announce a new rule of constitutional law, but rather 'adhere[d] to the line drawn' in its previous decision in *Illinois v. Caballes*, 543 U.S. 405 (2005)." ECF 202 at 8. It contends that *Rodriguez* merely reiterated principles previously announced in *Caballes*, but did not create an intervening change in the law. Thus, the government maintains that there is no basis for Wilson to claim that his argument was not reasonably available to him at the time of his appeal. ECF 202 at 8 (citing, *e.g.*, *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999), *cert. denied*, 529 U.S. 1010 (2000)).

In the government's view, Wilson "cannot demonstrate cause to excuse his procedural default." ECF 202 at 9; *see also id.* at 7. The government recognizes that the so called

"'procedural-default' rule is 'neither a statutory nor a constitutional requirement . . . .'" *Id.* ECF 202 at 7 (quoting *Massaro v. United States*, 538 U.S. 500, 504 (2003)). Nevertheless, the government observes that "'it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments.'"

Because Wilson does not claim actual innocence, the government also points out that he must show "cause" and "prejudice" to excuse his failure to raise this claim on appeal. ECF 202 at 6-7 (citing *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982)). This he cannot do, according to the government, because the factual and legal grounds for the claim were available to petitioner at the relevant time. *See Hedrick v. True*, 443 F.3d 342, 366 (4th Cir. 2006). Moreover, the government contends that Wilson cannot show prejudice as to the failure to raise the claim, because Wilson cannot show a violation of his Fourth Amendment rights. ECF 202 at 9. And, it argues that Wilson cannot establish cause based on counsel's failure to pursue Wilson's claim. *Id.* at 8 (citing *Murray v. Carrier*, 477 U.S. 478, 486-87 (1986)).

## C.

In this case, Corporal Kennard witnessed two traffic violations, which led him to effect a traffic stop of the vehicle in which Wilson as a passenger. Generally, an automobile stop "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Wilson*, 205 F.3d 720, 722-23 (4th Cir. 2000). When, as here, a vehicle is being driven contrary to the laws governing the operation of motor vehicles, that generally gives rise to reasonable, articulable suspicion to effectuate the stop. *Delaware v. Prouse*, 440 U.S. 648, 650 (1979); *Whren v. United States,* 517 U.S. 806, 817-18 (1996); *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993).

As the Fourth Circuit said in *United States v. Davis*, 460 F3d. App'x 226, 230 (4th Cir. 2011): "Traffic stops are justified at their inception when officers observe a violation of the applicable traffic laws."  Indeed, traffic stops are justified even when officers observe only minor violations, such as seatbelt violations.  *See*, *e.g.*, *United States v. Cleveland*, 597 Fed. App'x 172 (4th Cir. 2015) (per curiam) (affirming denial of motion to suppress where defendant claimed his consent to search was coerced after he was stopped for driving without a seatbelt); *United States v. Adams*, 462 Fed. App'x 369, 375 (4th Cir. 2012) (upholding stop for seatbelt violation, based on reasonable suspicion of violation); *United States v. Beckham*, 420 Fed. App'x 261, 263-64 (4th Cir. 2011) (same); *see also Hassan El*, 5 F.3d at 730 (holding that failure to stop at a stop sign was sufficient basis for defendant's detention).

However, "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle [only] for as long as it takes to perform the traditional incidents of a routine traffic stop."  *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009).  Therefore, a police officer "must possess a justification" for prolonging a stop "beyond the scope of a routine traffic stop. . . ."  *Id.*  at 336.  In other words, traffic stops must be limited in both scope and duration. *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011).

In *Digiovanni*, the Fourth Circuit reiterated that the propriety of a traffic stop is analyzed "on two fronts."  *Id.* at 506.  First, a court must analyze whether a police officer's action was justified at its inception.  Second, a court must consider whether the subsequent actions of the police officer were reasonably related in scope due to the circumstances that justified the stop. *Id.*  The Fourth Circuit made clear that "the seizure must be limited both in scope and duration." *Id.* at 507.

12

Judge Quarles issued his Memorandum Opinion denying the motion to suppress on November 18, 2011, several months after the Fourth Circuit issued its decision in July 2011 in *Digiovanni*. And, as noted, defense counsel brought *Digiovanni* to Judge Quarles's attention before he ruled. Clearly, Judge Quarles was aware of the case; he addressed *Digiovanni* in his Memorandum Opinion. *See* ECF 95 at 14 n.17.

The legal proposition as to scope and duration advanced in *Digiovanni* was not new, however. Many earlier Supreme Court and Fourth Circuit cases announced the same principle. For example, in 1983, in *Florida v. Royer*, 460 U.S. 491, 500 (1983) (purality opinion), the Supreme Court stated that a traffic stop must be "sufficiently limited in scope and duration to justify the conditions of an investigative seizure." The Court added that the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

The case of *Illinois v. Caballes*, 543 U.S. 405 (2005), involving a canine scan, was decided years before the traffic stop at issue in this case. The *Caballes* Court determined that a canine scan conducted during the course of a lawful traffic stop does not violate the Fourth Amendment's prohibition against unreasonable seizures. However, the Court also said that such a seizure "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of addressing the traffic violation. *Id.* at 407. The Court stated: "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. . . . A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." (Internal citation omitted). *Id.* at 407-08.

About ten years after *Caballes*, the Supreme Court decided *Rodriguez*, on which Wilson relies. In *Rodriguez*, 135 S. Ct. 1609, the Supreme Court considered whether "a dog sniff conducted after completion of a traffic stop" comports with the Fourth Amendment. *Id.* at 1612. The officer in *Rodriguez* performed a canine scan about seven or eight minutes after a written warning had been issued to the defendant and the officer had "got[ten] all the reasons for the stop out of the way." *Id.* at 1613. The Court held "that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 1612. It added: "A seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* (quoting *Caballes*, 543 U.S. at 407). Put another way, the Supreme Court ruled that police may not "extend an otherwise-completed traffic stop," absent reasonable suspicion, in order to conduct a dog sniff. *Id.* at 1614. Therefore, it remanded for a determination of whether "reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation." *Id.* at 1616–17.

Notably, the *Rodriguez* Court traced its ruling to *Caballes*, stating: "The Court so recognized in *Caballes*, and we adhere to the line drawn in that decision." *Id.* at 1615: It also said, *id.*: "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." Therefore, a canine sniff is unlawful if it prolongs the traffic stop, unless the detention is based on reasonable suspicion of criminal activity.

Many Fourth Circuit cases are to the same effect. I shall cite only a few of them.

*United States v. Guijon-Ortiz*, 660 F.3d 757, 766-768 (4th Cir. 2011), was decided just before Judge Quarles ruled here.  In *Guijon-Ortiz*, the Fourth Circuit noted that the principal inquiry is the officer's diligence in ascertaining whether a suspected traffic violation occurred and, if necessary, issuing a ticket.  The Court also said that a officer "may take other actions that do not constitute searches' within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle," as long as it does "'not measurably extend the duration of the stop.'" *Id.* at 765 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

*United States v. Mason*, 628 F.3d 123 (4th Cir. 2010), *cert. denied,* 132 S. Ct. 329 (2011), also preceded Judge Quarles's ruling.  In *Mason*, the trooper stopped the vehicle because he believed it had excessively tinted windows.  The stop was recorded on video.  *Id.* at 126.  The defendant challenged the constitutionality of the search of his vehicle on the ground that the trooper impermissibly extended the traffic stop to obtain probable cause to search the vehicle.

As the trooper approached the defendant, the trooper noticed that the defendant was nervous and sweating, and the trooper smelled an extreme odor of air freshener coming from the vehicle.  *Id.* at 126.  The officer briefly questioned the driver and his passenger, who gave conflicting stories.  These were among the reasons that led the officer to believe that the occupants were involved in criminal activity.  *Id.*  So, he called for a canine unit to respond to the scene with a drug detection dog.

In the interim, the officer was able to test the tint of the windows and determined that they were illegally tinted.  While the officer was writing a warning ticket, he was also relaying to his dispatcher information that is routinely provided as part of a traffic stop, in order to check for outstanding warrants and the like.  *Id.*  He finished the steps necessary to complete the traffic stop within about eleven minutes.  *Id.*  The canine unit arrived about a minute later and

immediately alerted.   The Fourth Circuit upheld the search, concluding that the continued detention was based on reasonable suspicion of criminal activity.   *Id.* at 128.   *See also, e.g.*, *United States v. McBride*, 676 F.3d 385, 394 (4th Cir. 2012).

*Branch*, 537 F.3d 328, is also instructive.   There, the defendant challenged a positive alert by a drug-sniffing dog that led to a search of his car.   *Id*. at 335.   He complained that he was unlawfully detained beyond the reasonable duration of the traffic stop.   *Id.*   The Court observed that "a dog sniff is not a search under the Fourth Amendment," and is "constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation."   *Id.* (citing *Caballes*, 543 U.S. at 407; *United States v. Place*, 462 U.S. 696, 707 (1983)).   The *Branch* Court also said, 537 F.3d at 336:   "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision.   Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose."

In sum, *Rodriguez* relied on *Caballes* and reiterated principles that were well established at the time the canine scan was litigated here.   Moreover, there was ample authority in the Fourth Circuit, pertinent to canine scans and scope and duration of traffic stops.   Thus, Wilson certainly was on notice of the issue.   Indeed, his lawyer raised it unsuccessfully before Judge Quarles and decided not to pursue the claim on appeal, presumably because the facts found by Judge Quarles did not support the contention of illegality.

## D.

The government also contends that under *Stone v. Powell*, 428 U.S. 465 (1976), Wilson cannot pursue his Fourth Amendment challenge on collateral review, because he had a full and fair opportunity to litigate his claim at the trial stage.   This contention is meritorious.

Wilson's claim centers on the constitutionality of the canine scan in the context of the traffic stop. The Supreme Court has said that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.[]"  *Stone*, 428 U. S. at 482; *see also id.* at 494 (reiterating that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim,[] a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at his trial").

In *Doleman v. Muncy*, 579 F.2d 1258, 1265 (4th Cir. 1978), the Fourth Circuit said:

[A] district court, when faced with allegations presenting Fourth Amendment claims, should, under the rule in *Stone v. Powell, supra*, first inquire as to whether or not the petitioner was afforded an opportunity to raise his Fourth Amendment claims under the then existing state practice.  This may be determined, at least in this Circuit, from the relevant state statutes, the applicable state court decisions, and from judicial notice of state practice by the district court.

Second, . . . when the district court has made the "'opportunity" inquiry, it need not inquire further into the merits of the petitioner's case, when applying *Stone v. Powell, supra*, unless the prisoner alleges something to indicate that his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired.

*See also Mueller v. Angelone*, 181 F.3d 557, 570 n.8 (4th Cir. 1999) (recognizing continued application of *Stone* post-AEDPA), *cert. denied*, 527 U.S. 1065 (1999); *Grimsley v. Dodson*, 696 F.2d 303, 304 (4th Cir. 1982) ("*Stone v. Powell* marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner has the opportunity to litigate those claims in state court.").

*Stone* applies equally to § 2255 proceedings.  *See United States v. Schulte*, 230 F.3d 1356 (4th Cir. 2000) ("When a litigant is provided a full and fair opportunity to litigate a Fourth

Amendment claim, he cannot re-litigate the claim in the motion pursuant to § 2255 unless there has been an intervening change in law."); *United States v. Cucci*, 166 F.3d 335 (4th Cir. 1998) (same); *see also United States v. Lee Vang Lor*, 706 F.3d 1252, 1257 (10th Cir.) ("We have expanded the *Stone* bar to § 2255 petitions."), *cert. denied*, ____ U.S. ____, 134 S. Ct. 679 (2013).

Clearly, Wilson had a full and fair opportunity to litigate the legality of the traffic stop. Thus, his Fourth Amendment claim provides no basis for federal post-conviction relief.

**E.**

Even if Wilson's Fourth Amendment claim were reviewable, it would fail on the merits.

As noted, Judge Quarles found that Kennard lawfully stopped the Toyota for the traffic violations of speeding and following too closely.  ECF 95 at 11 n. 11.  In this regard, Judge Quarles cited *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993), in which the Fourth Circuit said:  "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the car."  Thus, Judge Quarles found that "Kennard was justified in detaining the car while he performed traditional incidents of the stop, which included reviewing the rental agreement, running Ahorrio's license [five or six minutes into the stop], and beginning to prepare a warning."  ECF 95 at 11-12.

Judge Quarles also found that Tfc. Orndorff began the canine scan 11 minutes after the initial stop, and Camo alerted about 11 or 12 minutes after the initial stop.  *Id.* at 11–12.  And, Judge Quarles expressly determined that Kennard "had Orndorff perform a canine scan of the Car while Kennard wrote up the warning."  *Id.* at 12.   Judge Quarles relied on *Cabellas*, 543 U.S. 405, and *Branch*, 537 F.3d 328, for the proposition that a canine scan does not offend the

Fourth Amendment if, as here, it is performed within "'the time reasonably required' to issue a traffic citation." *See* ECF 95 at 12 n.13 (citations omitted).

I agree with the government, which asserts, ECF 202 at 11-12: "Nothing in *Rodriguez* calls into question the district court's determination that the canine scan did not prolong Wilson's detention beyond the time reasonably necessary for Cpl. Kennard to perform the traditional incidents of a traffic stop."

Alternatively, Judge Quarles expressly concluded that, even if the canine scan were not performed during the course of the stop itself, "continued detention would have been permissible because Kennard had reasonable suspicion that the Defendants were involved in criminal activity." ECF 95 at 12-13. Judge Quarles specifically identified the combination of facts that led to his conclusion. *Id.*

I discern no error in Judge Quarles's factual or legal conclusions.

The seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny permit a police officer to stop and detain an individual, for investigative purposes, without violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, so long as there is reasonable, articulable suspicion (or probable cause), based on specific facts, that criminal activity is afoot. *Id.* at 30; *see, e.g., Reid v. Georgia*, 448 U.S. 438, 440 (1980); *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). The dictates of *Terry* apply to routine traffic stops. *See*, *e.g.*, *United States v. Harvey*, 901 F. Supp. 2d 681, 686 (N.D. W. Va. 2012). So, "[i]n order to survive judicial scrutiny, the police officer's conduct during a traffic stop must be both 'justified at its inception' . . . and 'sufficiently limited in scope and duration.'" *Id.* (citations omitted).

Reasonable, articulable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity. . . ." *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *see United States v. Black,* 707 F.3d 531, 539 (4th Cir. 2013); *United States v. Massenburg*, 654 F.3d 480, 486 (4th Cir. 2011); *United States v. Griffin,* 589 F.3d 148, 152 (4th Cir. 2009). It "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but a "minimal level of objective justification [is required] for making the stop." *Illinois v. Wardlow*, 527 U.S. 199, 123 (2000); *see United States v. Lawing,* 703 F. 3d 229, 236 (4th Cir. 2012), *cert. denied*, 133 St. Ct. 1851 (2013); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000). Because the reasonable suspicion standard is an objective one, the officer's subjective state of mind is not considered. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013); *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011).

The question of reasonable, articulable suspicion is sometimes elusive. The Supreme Court has acknowledged the difficulty in pinpointing exactly what is meant by the term articulable suspicion. *Ornelas*, 517 U.S. at 699-700. In *United States v. Mason*, *supra*, 628 F.3d at 128, the Fourth Circuit reiterated that the concept of reasonable articulable suspicion "'is not readily, or even usefully, reduced to a neat set of legal rules, but, rather, entails commonsense, nontechnical conceptions that deal with factual and practical considerations of everyday life.'" (Citation omitted). Notably, it is determined by examining the totality of the circumstances. *See Wardlow*, 528 U.S. at 123; *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989); *Illinois v. Gates*, 462 U.S. 213 (1983); *United States v. Cortez*, 449 U.S. 411 (1981). But, as the Supreme Court said in *Terry*, 392 U.S. at 27, an officer conducting a *Terry* stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *See also Alabama v. White*, 496 U.S. 325, 329-30 (1990); *United States v. Bumpers*,

705 F.3d 168, 171 (4th Cir. 2013).   In other words, there must be some minimal level of objective justification for making the stop.

"A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *George*, 732 F.3d at 299 (citing *Wardlow*, 528 U.S. at 124).   In assessing reasonable suspicion, courts must "give due weight to commonsense judgments reached by officers in light of their experience and training."  *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see also United States v. Sowards*, 690 F.3d 585, 587-88 (4th Cir. 2012); *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010); *Branch*, 537 F.3d at 336-37.   Although each of a series of acts may, by itself, be innocent, taken together they can give rise to reasonable suspicion.  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).   In other words, the court may evaluate "cumulative information" available to the detaining officer.  *McBride*, 676 F.3d at 392.

For the reasons thoroughly recounted by Judge Quarles (ECF 95 at 12-13), he was not clearly erroneous in finding that the police had reasonable, articulable suspicion to justify prolonging the detention in order to allow Camo to perform the canine scan.

## F.

Wilson also alleges ineffective assistance of counsel.  It appears that Wilson's complaint is directed to trial counsel, not appellate counsel.  He argues that trial counsel failed to raise a challenge to the prolonged detention of the traffic stop when, in fact, counsel did raise that very challenge, *i.e.*, that the officers prolonged the traffic stop to conduct a canine scan, and did so without reasonable suspicion.  *See* ECF 28.

To challenge successfully a conviction or sentence under § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong

test set forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g.,* *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("To succeed on a Sixth Amendment claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland*."); *see also Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *Gordon v. Braxton*, 780 F.3d 196, 200 (4th Cir. 2015); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *Yarbrough v. Johnson*, 510 F.3d 327, 337 (4th Cir. 2008). *See generally Missouri v. Frye*, ___ U.S. ____, 132 S. Ct. 1399 (2012); *Laffer v. Cooper*, ___ U.S. ____, 132 S. Ct. 1376 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

First, the petitioner must show that his attorney's performance fell "below an objective standard of reasonableness," measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. This is known as the "performance prong" of the test, which relates to professional competence. In this regard, the petitioner must establish, by a preponderance of the evidence, that "'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.'" *Harrison v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687).

The performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison,* 389 F.3d 450, 457 (4th Cir. 2004)). "Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Branker,* 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Harrington*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122

(4th Cir. 2015).   Indeed, "the *Strickland* standard must be applied with scrupulous care." *Harrington*, 562 U.S. at 105.

As to performance, the central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 88 (quoting Strickland, 466 U.S. at 690).   The Supreme Court said in *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986): "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential."

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687.   To satisfy the "prejudice prong," a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Id.*

As the Supreme Court said in *Padilla*, 559 U.S. at 371, "Surmounting *Strickland's* high bar is never an easy task."   A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court need not address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015).   This is because the petitioner must prove both prongs in order to prevail; failure to satisfy either prong is fatal to a petitioner's claim. *Fields v. Attorney Gen. of Maryland,* 956 F.2d 1290, 1297-99 (4th Cir. 1985).   As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient

showing on one." *Strickland*, 466 U.S. at 697.   Thus, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

Trial counsel repeatedly challenged the entirety of the traffic stop, but the trial judge was not persuaded.   Although defense counsel was unsuccessful, there is no basis for Wilson's *Strickland* claim.

### III.    Conclusion

For the reasons stated above, I shall DENY Wilson's § 2255 Petition.   A certificate of appealability shall not issue.   An Order follows.

Date:   April 6, 2016                                                    /s/
                                                        Ellen L. Hollander
                                                        United States District Judge